Filed 5/9/25  P. v. Rodriguezkepley CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082102 |
| v. | (Super.Ct.No. INF2100281) |
| KENNETH MICHAEL RODRIGUEZKEPLEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dean Benjamini, Judge.

Affirmed in part, modified in part, and remanded for resentencing.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant

and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James

Spradley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Kenneth Michael Rodriguezkepley, aka Kenneth Michael Rodriguez Kepley, of two counts of sexual penetration with a child 10 years old or younger (Pen. Code, § 288.7, subd. (b)[1]) and one count of aggravated sexual assault of a child through sexual penetration as defined by section 289, subdivision (a) (§ 269, subd. (a)(5)).  On September 8, 2023, the trial court sentenced him to serve a total indeterminate term of 30 years to life in state prison.  He appeals contending:  (1) there is insufficient evidence of forcible sexual penetration (§ 269, subd. (a)) as alleged in count 3; (2) the court prejudicially erred in admitting the victim's text messages to a friend as prior consistent statements; (3) CALCRIM No. 1191B improperly and prejudicially allowed the victim to corroborate her own accusations; (4) expert testimony about child sexual abuse accommodation syndrome (CSAAS) was irrelevant and inadmissible; (5) the court erred in instructing the jury that it could consider CSAAS evidence in evaluating the believability of the victim's testimony; and (6) the court prejudicially erred in failing to instruct on a certain lesser included offense.  We agree the evidence is insufficient to support forcible sexual penetration as alleged in count 3; otherwise, we find no merit in his remaining arguments.  We modify defendant's conviction on count 3 to commission of nonforcible sexual penetration with another person who was under 18 years old (§ 289, subd. (h)), vacate the sentence, and remand the matter for resentencing.

---

[1] Unlabeled statutory references are to the Penal Code.

# I. PROCEDURAL BACKGROUND AND FACTS

## A. The Prosecution's Case.

### 1. The family

The victim, Jane Doe (born in 2009), was eight years old when her mother, C.P. (herein mother), began dating defendant in 2017.  In 2018, the three began living together in Palm Desert, and the couple married in January 2020.  As a stepfather, defendant was very forceful, telling Doe, "I'm taking care of you" and "to call him dad."  He required Doe to wash dishes, clean her room, and take out the trash.  This made Doe angry; she would refuse to do what defendant asked and talked back, telling him, "You're not my dad," and "Who are you to tell me what to do?"  Mother perceived that it was difficult for Doe to accept defendant as a father figure and told him to speak with more empathy.

Doe has several half sisters who live in Texas; two of them reside with her biological father, who was a central figure in her life until she was two years old.  Doe saw her sisters during summer visits to Texas and thought about what it would be like to live in Texas.  She would have liked to live with her father, but he was "short on money."  In California, Doe felt left out because mother spent too much time with defendant.  As his presence in her life became an issue; she threw tantrums, stated a desire to live in Texas, and threatened suicide.

From 2017 to 2021, mother worked long hours and entrusted defendant with Doe's supervision.  Sometimes, when mother returned home, she would see the two sleeping in the same bed, but it did not concern her because Doe was afraid of the dark.

In March 2020, Doe began having hygiene problems and had to be reminded to take a shower.

In February of 2021, when Doe was in the 6th grade, a social worker with Child Protective Services (CPS) and two deputy sheriffs came to the family home, informed mother about an accusation, and interviewed her and Doe. Mother ended her relationship with defendant and moved Doe to Los Angeles County.

### 2. *Doe's text messages to S.T.*

In 2021, S.T. and Doe attended sixth grade through online school. They exchanged phone numbers and got to know each other over text messages. In February, Doe texted that "her stepdad was touching her," but told S.T. "not to tell anyone" and to delete the text. After confirming that Doe was safe, S.T. deleted the message. On February 20, 2021, S.T. told her mom, R.T., about the text. R.T. called the police and told Deputy Sheriff Kendall Martinez that one of her daughter's classmates was being touched inappropriately by her stepfather. R.T. and S.T. recovered Doe's deleted text messages, read them to the deputy over the phone, and sent them to him via emailed screenshots.

### 3. *Doe's first interview*

After speaking with another friend of Doe, Deputy Martinez called Child Protective Services. The deputy, a sergeant, and social worker Lakeya Johnson went to Doe's home and interviewed her. Doe told Johnson that defendant had touched her inappropriately on her breasts and inside her vagina. She did not tell her mom about the

4

touching because defendant told her not to and she was scared, but she wanted it to stop because it made her uncomfortable. Doe was referred for a forensic interview.

### 4. *The forensic evidence*

On February 22, 2021, Denise Bowman interviewed Doe who reported that she was eight or nine years old when she first met her stepdad. He first touched her when she was nine years old and continued doing so until she was 11. She said that he used his hand and touched her "down there and it was just very uncomfortable, and [she] didn't like it at all." Doe defined down there as her private part where "we pee." The first time it happened, defendant asked her to take a nap in his bedroom. While in bed, he put his hand underneath her shorts and underwear, moving it "and then he went in [her] pee hole, and it would start to hurt a lot." She said that she almost cried. He told her not to tell anyone. The last time he touched her vagina was in January of 2021 when she was in the sixth grade. Defendant put his finger in her pee hole, causing pain.

Doe described a touching in January 2021 when she was packing to go to her grandmother's house and defendant asked her to take a nap with him. She was not tired, but he kept asking, so she complied. He put his hand inside her shirt and grabbed her breasts. Sometimes he would fall asleep but if she tried to get away, he would grab and restrain her. When she heard him say take a nap, she was "scared." She "kind of had a panic attack and . . . was just really scared and . . . couldn't, like it was hard to breathe." The same thing happened when she was in the fifth grade.

One time, in November 2020, defendant went into her bedroom at night, put his hand down her pants causing pain, and grabbed her breasts. When she was in the fourth

5

grade, he told her to come in his room to watch TV, but then insisted they take a nap instead. He grabbed her and put his hand down her pants. He would also make her shower with him (about five times) and told her not to tell her mom. This upset her and "stressed [her] out." While naked in the shower, he would stare at her in an uncomfortable way. When she asked him not to shower with her, he replied, "Why?"

On February 23, 2021, Nurse Practitioner Kelly Deckard performed a 30-minute non-acute exam on Doe and took pictures of her vagina and anus. Although the exam revealed some abnormal findings, they were not specific to sexual abuse.

*5. Doe's testimony*

Doe became emotional when she identified defendant, explaining she was shocked to see him and scared to be at court. She was first introduced to him when she was eight years old and in the third grade. Soon after, he moved into her home, and her mother married him in January of 2020.

Doe testified that defendant touched her in a way that made her feel uncomfortable on multiple occasions when she was nine, 10, and 11 years old. He first touched her when she was in the fourth grade (2018-2019 school year). She identified private parts as her breasts, butt, and where she goes pee. He used his hand and touched her private area (the one used "for peeing") underneath her clothing. She could not recall what he did with his hand or how long the touching lasted, but she later stated that his hand went between the lips of her vagina. Afterwards, he told her not to tell anyone, and she did not do so because she was afraid he would threaten her or people would not believe her.

6

On one occasion, when Doe was in the fourth or fifth grade, defendant pulled her into the master bedroom (to take a nap) and closed the bedroom door. He touched her private area "between the legs" underneath her underwear. He rubbed against her skin. She did not say anything because she feared he might do something worse. When she tried to move away, he pulled her back. He penetrated her vagina with his finger, causing her tightness and pain.

When Doe was in the sixth grade, attending online school, defendant touched her after her mom left for work. He would get into her bed under the covers and touch her vagina with his hand—skin to skin. He also touched her breasts on several occasions. On one occasion, he went into her room around midnight when her mom was asleep; she woke up when she heard her door creak open. He walked to her bed, got under the covers, and touched her breasts. This happened when she was in the fourth or fifth grade. Doe did not tell anyone; the touching made her feel uncomfortable and afraid.

One time when Doe was 10 years old (after defendant had touched her), he told her to go in the master bedroom shower, and he joined her. They were both naked. She tried to not look at him because she was scared to see him naked. On another occasion, he joined her in the shower; again, she felt uncomfortable. Doe tried not to look at him. He told her not to tell her mom that they were taking showers together.

By way of text messages, Doe told three friends (S., R., and B.) about defendant's actions, but told them not to tell anyone or post it on social media.[2] In February 2021,

---

[2] An expert in CSAAS testified for the prosecution; her testimony is summarized in argument II.D.1.

7

she reported defendant's actions because she wanted them to stop. Doe previously told B., her best friend, about defendant's actions. Immediately before and after her interview with the deputy and social worker, Doe texted B. that her mother found out; B. replied that defendant should get what he deserves. Doe said she told a lady and a police officer who had come to her home. B. replied, "At least you told an adult. . . . [¶] . . . [Good job bestie]. . . . [¶] . . . So what happened? Did your mom break up with your stepdad?" Doe stopped responding because she had given her phone to the deputy.

### B. *The Defense.*

Patricia Z. (Patty) lived with Doe and her mom from September 2017 through March of 2020; Doe called her Grandma Patty and the two spent a lot of time together. Patty testified that defendant moved in with them in 2018, but she was often not at the home because she had a full-time job and was "pretty active in [the] community."

Ruben T. met defendant in 2017; the two worked together and played video games after work. Between 2018 and 2021, Ruben went to defendant's home; sometimes Doe was there. He once heard defendant tell her to do the dishes, but she "looked at him," and said, "Who are you to tell me to do the dishes?"

## II. DISCUSSION

### A. *Insufficient Evidence of Aggravated Sexual Assault*

In count 3 of the information, the prosecution alleged, and the jury later found, that between August 17, 2020, through February of 2021, defendant committed an aggravated sexual assault of Doe, in violation of section 269, subdivision (a). Defendant

8

contends there is insufficient evidence to show that he used force, fear, violence, menace, or duress to accomplish this act. We agree.

### 1. *Standard of review*

""""In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"" [Citation.] It is not our job to reweigh witness credibility or the evidence. [Citations.]" (*People v. Martinez* (2024) 105 Cal.App.5th 178, 188-189.)

### 2. *Legal principles*

An aggravated sexual assault, as defined in section 269, subdivision (a), includes the charged crime of sexual penetration upon a child. (§§ 269, subd. (a)(5) & 289, subd. (a)(1)(B)); see CALCRIM No. 1123.) A conviction for this crime requires substantial evidence the act of sexual penetration was "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim." (§ 289, subd. (a)(1)(B).) A showing of use of any one of the factors of force, fear, violence, or duress will suffice to establish the offense is an aggravated sexual offense. (§ 289, subd. (a)(1); see CALCRIM No. 1045.)

*3. Analysis*

According to Doe, count 3 occurred when she was 11 years old, in the sixth grade, between August 2020 and February 2021; defendant came into her bedroom in the middle of the night, put his hand down her pants, and placed his finger in her "pee hole" and it hurt. While testifying, Doe did not remember how defendant touched her or if his fingers went between the lips of her vagina, but she did say the touching was skin to skin. The jury received CALCRIM No.1045. During closing, the prosecutor argued defendant used force by grabbing or pulling Doe back when she tried to get away. He also maintained that duress was present because Doe was only 11 years old while defendant was an adult, he was bigger, stronger, a parental figure, he decides what she gets to do, she felt threatened, and she felt afraid to disclose his actions.[3] In response, defense

---

**3** "The . . . defendant accomplished the act by force, fear, duress, or menace.·. . . [¶] . . . An *act is accomplished by force* if a person uses enough physical force to overcome the other person's will. [¶] Oh, you mean *like grabbing them and pulling them back when they try to get away?* They're only 9 years old, 10 years old, 11 years old.· When he's bigger, stronger. *That's force.* That's just one theory.· That's just one way. Because we see the 'or.' 'Force, fear, violence, duress, or menace.' I would submit that's been proven in the way the defendant goes about conducting his business. [¶] But we have this definition of duress here. And I would submit it's just as the judge read it. That's the law. [¶] *Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do something that he or she would not otherwise do.* [¶] Then it gives us more instruction on this: [¶] When deciding whether the act was accomplished by duress, *consider all the circumstances, including the age of the other person and her relationship to the defendant.* [¶] So *an 11-year-old compared to the defendant, we know that one is in a position of power.* He gets to decide if he wants to exact a punishment. He gets the power of being there, deciding what she gets to do, has the power of being bigger, stronger, the parental figure. [¶] *We heard from (Jane Doe) as she talked about the incidents, that she felt threatened.* That when the defendant told her, 'You can't tell your mom,' how she felt, how *she felt afraid to even disclose it to anyone.*

*[footnote continued on next page]*

counsel argued there was no evidence defendant used force to accomplish the act, or that Doe was afraid of defendant: "Count 3, the aggravated sexual assault. . . . [Doe] says two different things with regard to Count 3. She says it was hugging or – and later on in the video, she says it was penetration. . . . [¶] . . . [¶] . . . Other time, touched vagina in the 6th grade, 6:30 a.m., under the covers, don't remember if it hurt or not. [¶] *But we're not hearing about any other force that is used to accomplish this act.* And what the *prosecution is then relying on is a backup plan, is that because of his position in the household, because he was stepdad, that she was afraid.* [¶] *She wasn't afraid of him.* He never spanked her. He never threatened her. He never disciplined her even. She spoke her mind. She spoke her mind on a daily basis. She spoke her mind when she says, 'You're not my dad.'"

As applied to aggravated sexual assault crimes, "'[a] defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act.' [Citation.] 'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial." Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.' [Citation.] '[A]cts of grabbing, holding and restraining that occur in

---

[¶] I would submit these are the sort of circumstances we can look at to determine if duress is here. That sort of *interplay of power the defendant took.· His stepdaughter?· I'd submit that's duress.* It's met by force, but I would submit also duress. *The defendant accomplished his act by using force and duress.*"

11

conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force. [Citation.]" (*People v. Morales* (2018) 29 Cal.App.5th 471, 480.) The trial court instructed the jury that "[a]n act is *accomplished by force* if a person uses enough physical force to overcome the other person's will." (CALCRIM No. 1045.)

On appeal, defendant argues there was "absolutely *no* evidence presented" that he "pulled [Doe] either into a bedroom or closer to his body while she tried to get away. [He] said absolutely nothing to her on this occasion" that occurred sometime between August 2020 and February 2021. We agree. Nonetheless, the Attorney General argues defendant's "forcible conduct on [the] prior occasions[ when Doe was nine and 10], coupled with evidence that the act in count three was analogous to the acts during prior occasions, constituted circumstantial evidence that [he] also used force in count three." Not so. Defendant was charged with three separate acts, and "the distinctions between these acts is important." As to count 3, the record is void of any evidence that defendant moved Doe, physically restrained her, or grabbed her to stop her from leaving in order to accomplish the charged offense. (See *People v. Morales*, *supra*, 29 Cal.App.5th at p. 480 [force used when defendant held the victim in such a way that she could not move while he positioned her up against the trunk of a tree and penetrated her private parts with his finger]; *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 ["acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" satisfied the force requirement.].) Thus, there is insufficient evidence the aggravated sexual assault was committed by force. We now consider whether there is sufficient evidence of duress.

12

"'[D]uress involves psychological coercion.  Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . .  "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.'"  (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320 (*Espinoza*).)  "'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.'  [Citations.]"  (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.)  Because "duress is measured by a purely objective standard," "the focus must be on the defendant's wrongful act, not the victim's [subjective] response to it."  (*People v. Soto* (2011) 51 Cal.4th 229, 246.)

In *Espinoza*, the Court of Appeal considered whether the defendant committed multiple lewd acts by duress.  The victim was the defendant's 12-year-old daughter and a student in special education classes.  (*Espinoza*, *supra*, 95 Cal.App.4th at p. 1292.)  When he molested her on five occasions, she was "'too scared to do anything. . . .'"  (*Id*. at pp. 1292-1293.)  After reporting his actions to school personnel, the victim was "'very worried about her own safety in going home.'"  (*Id*. at p. 1295.)  The *Espinoza* court understood "'[d]uress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . .  "Where the defendant is a family member and the victim is young, . . . the position of dominance and

13

authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.'" (*Id*. at p. 1320.)

Nonetheless, the *Espinoza* court found insufficient evidence of duress, explaining: "The only way that we could say that defendant's lewd act on [the victim] and attempt at intercourse with [her] were accomplished by duress is if the mere fact that he was [her] father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress. What is missing here is the '"direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted."' [Citation.] Duress cannot be established unless there is evidence that 'the victim['s] participation was impelled, at least partly, by an implied threat . . . .' [Citation.] No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind. While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Espinoza*, 95 Cal.App.4th at p. 1321.) The court noted "'the Legislature has recognized that all sex crimes with children are inherently coercive.'" (*Ibid*.)

Here, as in *Espinoza*, there is no evidence defendant used any direct threats when committing the offense charged in count 3. Nonetheless, the Attorney General argues

14

(1) the reasoning in *Espinoza* "has been undermined in other cases," (2) the case is "factually distinguishable," and (3) the evidence shows that defendant "caused Jane Doe's fear of harm through an implied threat, and at the very least knowingly took advantage of her fear to sexually exploit her." We are not convinced by these arguments. First, *Espinoza* remains good law. Second, the factual differences amount to distinctions without a difference given the similarities. As in *Espinoza*, defendant did not grab or restrain Doe, nor did she resist, cry, or ask defendant to stop or leave her bedroom. And finally, there is no evidence defendant caused Doe's fear through any threats, direct or implied, that she would suffer adverse consequences if she did not acquiesce to defendant's demands. While she admitted she was "afraid of him threatening [her] or something or, like, people not believing [her]," she admitted he did not threaten her. Moreover, Doe did not fear defendant, as evidenced by her talking back to him, exclaiming, "You're not my dad!" and "Who are you to tell me what to do?"

In short, there is insufficient evidence defendant committed the offense charged in count 3 by means of force, fear, violence, menace, or duress. However, he admits there is evidence of sexual penetration. When there is overwhelming evidence that a defendant is guilty of a lesser included offense, the conviction may be reduced to the lesser offense. (§ 1181; *People v. Steger* (1976) 16 Cal.3d 539, 553; *People v. James* (2014) 230 Cal.App.4th 1256, 1265.) Accordingly, we reduce defendant's section 269, subdivision (a), conviction to reflect a conviction of the lesser included offense of nonforcible sexual penetration under section 289, subdivision (h), and remand the matter for resentencing. (*Espinoza*, *supra*, 95 Cal.App.4th at pp. 1321-1322.)

15

*B. Admission of Doe's Text Messages as Prior Consistent Statements*

Defendant contends the trial court erred in admitting Doe's text messages pursuant to Evidence Code section 791.

*1. Further background information*

Prior to Doe testifying, the prosecutor informed the trial court he intended to introduce her text messages to her friend as prior consistent statements. The court reserved ruling on the matter.

On direct examination, Doe testified that she first tried to lie to the deputy and the social worker by denying being touched by defendant. On cross-examination, defense counsel challenged her trial testimony as being inconsistent with her initial denial of being touched. Prior to re-direct, the prosecutor sought to admit the text messages between Doe and her friend, B. Defense counsel objected on the grounds of multiple hearsay, explaining he was impeaching Doe's current testimony, not her prior statements. Referencing Evidence Code, section 791, subdivisions (a) and (b), the trial court explained there are multiple ways for prior consistent statements to come in.[4] The court found that, during cross-examination, there was "an implication at least that [Doe] is not

---

[4] The trial court summarized Evidence Code section 791, as follows: "'Evidence of a statement previously made by a witness that is consistent with their testimony at the hearing is inadmissible to support credibility unless it is offered after.' [¶] And then we get section (a). 'Evidence of a statement made by the witness that is inconsistent with any part of the testimony at the hearing has been admitted for the purpose of attacking credibility, and the statement was made before the alleged inconsistent statement'; [¶] 'Or,' subdivision (b), 'An express or implied charge has been made that the testimony at the hearing is recently fabricated or is influenced by a bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen.'"

16

telling the truth now about what happened." However, the court asked the parties to address whether Doe's earlier statement was made prior to the time for a motive to fabricate or bias existed. Defense counsel argued that a bias or motive existed when Doe reached out to S. weeks prior to her (Doe's) text messages to B. Counsel explained that because there was no recent fabrication, Evidence Code section 791 did not apply. The prosecutor argued that Doe was not lying when she told her friends what was happening because she told them not to say anything. However, the prosecutor noted that defense counsel had highlighted Doe's failure to tell the social worker and the initial responding officer about the "depth or full extent of what happened to her."

Acknowledging Doe's silence about what had happened, the trial court found Doe's text messages to B. admissible under Evidence Code section 791, subdivision (a). The court explained, "[T]he testimony did come out that—on cross-examination, that initially she did not state that it happened—and I'm paraphrasing here, obviously—because she was so scared. This is when she's talking to the social worker. And then after that, she said that it did happen. [¶] If there is a statement which was made prior to that inconsistent statement because that statement—that telling the social worker that it didn't happen is inconsistent with her testimony, obviously, here on the stand that it did happen. And then if there is a statement prior to that in which she also said that it happened, it appears to me that at least that much should be admissible under [Evidence Code section] 791[, subdivision ](a). . . . [¶] I think the motive to fabricate arose at the point she decided that she no longer wanted [defendant] in her life, and she would rather go somewhere else. I think that's where the motive to fabricate arose, if there was

17

fabrication, and I'm not making a judgment one way or the other, but if there was fabrication, that was the motive. That is the improper motive, is to lie because she doesn't like [defendant], or call it for what it is. [¶] So I think that the statements prior to that—the statements made to [S., B.], those all arose way after that motive." Defense counsel replied, "Yes. I'll submit, Your Honor." The court also warned the prosecutor to be careful of questions invoking multiple layers of hearsay.

2. *Legal principles*

Evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated is hearsay and is generally inadmissible. (Evid. Code, § 1200.) Evidence Code section 791 provides that, except in two specified circumstances, out-of-court statements by a testifying witness that are consistent with the witness's testimony fall within this hearsay prohibition. Under the first exception, prior consistent statements may be admitted if they predate an inconsistent statement used to impeach the witness's testimony. Under the second exception, prior consistent statements may be admitted after the witness's testimony has been challenged as "recently fabricated or [a]s influenced by bias or other improper motive," so long as the prior consistent statement was made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code § 791, subd. (b); see *People v. Kennedy* (2005) 36 Cal.4th 595, 614.) Additionally, Evidence Code section 1236 reiterates that "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his [or her] testimony at the hearing and is offered in compliance with [Evidence Code s]ection

18

791."  A challenge to a trial court's rulings under Evidence Code sections 791 and 1236 is reviewed for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 725 [abuse of discretion standard of review applies "to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question"].)  In evaluating whether there was an abuse of discretion a """decision will not be reversed merely because reasonable people might disagree.""" (*People v. Carmony* (2004) 33 Cal.4th 367, 377 [no abuse of discretion "unless [court's] decision is so irrational or arbitrary that no reasonable person could agree with it."].)

*3. Analysis*

Defendant argues Doe's text messages to B. did not qualify as prior consistent statements under Evidence Code section 791 "because any inconsistent statement [she] may have made to [the deputy or social worker] was *not admitted for the purpose of attacking her credibility*."  According to defendant, Doe admitted, on direct examination, that she "tried to lie" to the deputy and the social worker, but then told them what happened because she wanted the touching to stop.  Defendant asserts the prosecutor's questions were not aimed at attacking Doe's credibility; rather, they sought to elicit evidence about when she felt ready to tell somebody, other than the friends, about defendant's actions.  Defendant further asserts that his trial counsel did not ask Doe any "questions in order to attack her credibility.  If anything, defense counsel rehabilitated her credibility."  Thus, defendant argues the admission of Doe's text messages with B. "improperly bolstered the credibility of her testimony, [and] amounted to a denial of state and federal due process by rendering the trial fundamentally unfair."  We disagree.

19

Defendant would have us believe that his trial counsel questioned Doe about her inconsistent statements for the purpose of "rehabilitating" her credibility. However, his assertion runs afoul of counsel's direct representations at trial. According to trial counsel, the defense sought to use Doe's prior statements to the detective and the social worker to impeach her current testimony because, as defendant admits, "[t]he prosecution's entire case depended on Jane Doe's credibility." As such, the trial court properly admitted the text messages as prior consistent statements which predate Doe's inconsistent statements to the detective and the social worker that defense counsel sought to use for impeachment purposes. Also, the jury was instructed that it could consider a witness's prior statements "[t]o evaluate whether the witness's testimony in court is believable" and "[a]s evidence that the information in those earlier statements is true." (CALCRIM No. 318; *People v. Thomas* (2023) 14 Cal.5th 327, 394.)

### C. *The Trial Court Properly Instructed the Jury with CALCRIM No. 1191B*

Defendant contends the trial court committed prejudicial error in instructing the jury with CALCRIM No. 1191B because it lowered the prosecution's burden of proof. He asserts the instruction, "as given in this case, improperly allowed Jane Doe to corroborate her own accusations," by allowing her accusations "on one of the charges relating to her to support an inference that [defendant] 'was likely to commit and did commit' the remaining counts relating to her." The Attorney General argues defendant "mischaracterizes the instruction," "overstates the inference it permits," the California

20

Supreme Court has upheld CALCRIM No. 1191B, and the instruction did not violate defendant's right to due process.[5]

1.  *Further background information*

The trial court instructed the jury with CALCRIM No. 1191B, which provides: "The People presented evidence that the defendant committed the crimes charged in Counts 1-8.  [¶]  If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case.  [¶]  If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence.  *It is not sufficient by itself to prove that the defendant is guilty of another crime.  The People must still prove each charge beyond a reasonable doubt*."  Defendant did not object to this instruction; however, he requested that it state "'The People . . . must still prove the charge beyond a reasonable doubt' . . . [¶] . . . [¶] . . . 'each charge.'"

---

[5]  To the extent defendant challenges CALCRIM No. 1191B as telling the jury that "it could conclude from the evidence on Count 2 that [he] also committed Count 3," we have concluded there was insufficient evidence of force or duress to support the conviction of aggravated sexual assault (§ 269, subd. (a)) as charged in count 3.  (See discussion at II.*A*.)  Nonetheless, we consider defendant's argument as a general challenge to CALCRIM No. 1191B.

## 2. Standard of review

"[I]nstructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480.) "We review a claim of instructional error de novo. [Citation.] 'When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Mataele* (2022) 13 Cal.5th 372, 419.)

## 3 Analysis

Citing *People v. Stanley* (1967) 67 Cal.2d 812 (*Stanley*) and *People v. Scott* (1978) 21 Cal.3d 284 (*Scott*), defendant contends CALCRIM No. 1191B violates California law because it allows for the admission of the complaining victim's testimony as to other offenses without corroboration. In *Stanley*, "our Supreme Court recognized the problem raised by the victim-witness's testimony of uncharged crimes. The court, however, refused to adopt a rigid rule for the admission or exclusion of such evidence. Instead, the court said admission should be determined by '"a weighing of the probative value of the evidence offered against the harm it is likely to cause."' [Citation.] In . . . *Scott* . . . our Supreme Court reversed a conviction for child molestation and incest on other grounds. For guidance on retrial, however, the court stated that evidence of uncharged sexual conduct by the testimony of the victim is inadmissible. In so stating, the court cited *Stanley* without discussion. [Citation.] [¶] [However, b]oth *Stanley* and *Scott* were

22

decided prior to the enactment of Evidence Code section 1108, subdivision (a). [Citation.] Prior to the enactment of [Evidence Code] section 1108, evidence of the defendant's disposition to commit a sex offense was generally excluded. [Citation.] After the enactment of [Evidence Code] section 1108, courts can no longer exclude such evidence as prejudicial per se, but must engage in a weighing process under [Evidence Code] section 352. [Citation.]" (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 501-502 [giving former CALCRIM No. 1191 (which dealt only with uncharged sexual offenses) is proper where evidence of the uncharged sexual offenses comes only from the victim herself because a victim's own testimony adds nothing to her credibility].)

More importantly, and as defendant acknowledges, the California Supreme Court has held that Evidence Code section 1108 properly permits the prosecution to use evidence of sex offenses charged in the current prosecution to show a propensity to commit other charged offenses in the same case. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1161-1162 (*Villatoro*).) However, he maintains "CALCRIM No. 1191B, as given in this case, improperly allowed Jane Doe to corroborate her own accusations," and "respectfully urges *Villatoro* be reconsidered." We decline doing so. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*) ["The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California."].)

"[T]he primary issue [in *Villatoro*] was whether [Evidence Code] section 1108 permitted the jury to consider evidence of other charged sexual offenses as propensity evidence. [Citation.] The majority opinion held that [Evidence Code] section 1108

23

extended to both charged and uncharged offenses.  In the course of reaching that conclusion, the court explained, 'Rather than imposing an additional hurdle to the admissibility of character evidence, . . . the inclusion of [Evidence Code] section 352 merely makes "explicit" the point that [Evidence Code] section 1108 does not supersede [Evidence Code] section 352 or other provisions of the Evidence Code.  In other words, even if [Evidence Code] section 1108 did not refer to [Evidence Code] section 352, the latter still serves as a limitation on the admission of all evidence.'  [Citation.]  The court also observed that [Evidence Code] section 1108 was enacted to 'put[] evidence of similar sexual offenses "on the same footing as other types of relevant evidence" not subject to a special exclusionary rule.'  [Citation.]  Thus, the rule that courts have no sua sponte responsibility to conduct [an Evidence Code] section 352 analysis applies even when the proffered evidence is of other sexual offenses."  (*People v. Caratachea* (2024) 107 Cal.App.5th 392, 398.)

Nonetheless, defendant contends the *Villatoro* majority "pointedly noted that it did 'not decide . . . whether courts should give such an instruction in the future.'"  Relying primarily on Justice Corrigan's concurring and dissenting opinion, he asserts CALCRIM No. 1191B "'contradicts long-standing precedent, expands multiple sections of the Evidence Code in ways not contemplated by the Legislature, and sows the seeds for confusion and unintended consequences.'"  He further argues "the majority's opinion offered no distinction between evidence and inferences."  However, "[w]hatever inferences may or may not be drawn from a comparison of the majority and dissenting opinions in *Villatoro*, . . . [t]he other sexual offenses at issue in *Villatoro* [and this case

24

involve] *charged* offenses.  [Citation.]  Evidence of their commission could not be excluded, as would be true in a case where the prosecution sought to introduce evidence of uncharged sexual offenses under [Evidence Code] section 1108 and a[n Evidence Code] section 352 analysis indicated that the [probative value was not outweighed by their] prejudicial effect[.]"  (*People v. Caratachea*, *supra*, 107 Cal.App.5th at p. 398.)

In light of *Villatoro*, which approved an instruction that essentially became CALCRIM No. 1191B, as well as the analysis in *Gonzales* concerning section 1108 and *Stanley*, we conclude that CALCRIM No. 1191B is consistent with California law. Therefore, the trial court properly charged the jury with CALCRIM No. 1191B.  (See *Villatoro*, *supra*, 54 Cal.4th at pp. 1167-1169; *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68 [*Villatoro's* reasoning forecloses arguments that CALCRIM No. 1191B improperly allows "the jury to rely on currently charged offenses to find that [the defendant] had committed other currently charged offenses . . . ."]; *Gonzales*, *supra*, 16 Cal.App.5th at pp. 501-502.)

*D.  The Trial Court Properly Admitted CSAAS Evidence*

Defendant challenges the trial court's decision to admit the testimony of Monica Borunda about CSAAS.

*1.  Further background information*

The prosecutor sought to admit the testimony of Borunda about CSAAS.  Defense counsel objected to the introduction of CSAAS evidence, "[n]o matter what witness it's coming from."  Counsel explained, "I know the Court has reviewed and mentioned some of the Supreme Court cases upon which it's relied to decide that the evidence will come

in but only for a limited purpose, and the Court will give CALCRIM 1193; however, those cases are now over a decade old . . . . [¶] The public has heard about the Catholic church sex abuse scandal which was in the news for quite some time and reappears in the news from time to time. The public has heard about Larry Nassar, the U.S.A. gymnastics coach, who was involved in a nationwide sex abuse scandal of his own gymnastics' athletes. The public has heard about a USC gynecologist who was found to have committed sexual assaults on several undergraduates, his name is George Tyndall. [¶] More importantly, [the prosecution] spent several days voir diring this exact jury about particular misconceptions regarding child sexual assault abuse reporting, and they had none. [¶] The introduction of this evidence presupposes that the jury does have some misconception about child abuse reporting, that they do hold some kind of myth. I know [the prosecution] has identified that, as is required by law, but we're making assumptions about what the jury may believe. [¶] He voir dired on that. He exercised 3 or 4 peremptories. He had 14 more or 15 more to exercise. Chose not to exercise them, so I don't think this evidence is appropriate. [¶] If the Court does still intend to allow such evidence, then I would request voir dire of Ms. Borunda outside the presence of the jury prior to her taking the stand and giving evidence in this case."

In response, the prosecution argued the evidence is necessary to dispel any myths the jurors may have about late reporting or disclosure patterns regarding the sexual assault allegations. Relying on the "entirety of the controlling case law," the trial court found the evidence to be admissible.

26

After the trial court instructed the jury with CALCRIM No. 1193, Borunda testified that CSAAS includes concepts that help people understand children's behavior after they have been abused. She described the five categories of CSAAS (secrecy, helplessness, entrapment or accommodation, delayed and unconvincing disclosure, and retraction or recanting), but noted that every category may not necessarily be present for every victim of child molestation. She stated CSAAS is not a diagnostic tool; rather, it helps to explain myths that existed in the 1980's regarding disclosure patterns of child victims. She identified most people's common misconception that a child will tell an adult when something has happened, adding a child molested by a stranger is more likely to tell someone than a child who is close to his or her abuser. She explained that most sexual abuse occurs more than one time, sometimes over the course of months or years, and usually only the victim and the perpetrator know about the abuse. She added that victims often feel helpless, they look to family members to keep them safe, they do not know how to disclose the abuse, they do not realize the behavior is wrong, and there is nowhere for them to go. Some children are afraid to tell someone; they fear they will not be believed. Thus, delayed disclosure is common, along with recanting their accusations.

Borunda had not read any reports, reviewed any interviews, nor talked with the victim or any witnesses in the instant matter. She offered no opinion as to whether Doe suffered sexual abuse.

2. *Legal principles*

"While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred," California courts have long held such evidence admissible in child sexual

abuse cases to "disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Such evidence "'is needed . . . to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301, (*McAlpin*); see also *Gonzales*, *supra*, 16 Cal.App.5th at p. 504 ["The purpose of CSAAS is to understand a child's reactions when they have been abused."].) California courts have held that expert testimony regarding CSAAS "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300; see also *Gonzales*, at p. 503.) Thus, "it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, at p. 171.)

> 3. *Analysis*

Defendant contends the trial court erred in admitting CSAAS evidence because such evidence is irrelevant after the "#MeToo" explosion and "the recent high profile rash of sexual abuse reporting in the media has served to negate any misconception the public may previously have held about delayed and inconsistent reporting," and there is no evidence the jurors in this case held "any misconceptions about the behavior of children who had been sexually abused." We conclude the court did not err by admitting CSAAS evidence.

CSAAS evidence is admissible to rehabilitate the testimony of a child molestation victim "when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; cf. *People v. Brown* (2004) 33 Cal.4th 892, 895-896, 906-907 [applying the same reasoning to uphold the admission of expert testimony regarding battered women's syndrome]; also, *Lapenias*, *supra*, 67 Cal.App.5th at pp. 172-173 ["CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused."]; *People v. Julian* (2019) 34 Cal.App.5th 878, 885; *People v. Wilson* (2019) 33 Cal.App.5th 559, 561; *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956 (*Housley*).) Nonetheless, defendant argues CSAAS evidence is irrelevant because, after the #MeToo explosion and "the recent high profile rash of sexual abuse reporting in the media" (including Woody Allen, the Catholic Church, college football coach youth programs, and the Olympic women's gymnastic team), "the general public is now well aware that children who suffer sexual abuse may not report that abuse for years, and may not do so consistently, or that they may choose to stay with and be close to their abusers." However, defendant offers no evidence to support this assumption, and we do not accept it. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 172 [CSAAS testimony may have informed some jurors that Doe's apparent

29

accommodation, helplessness, secrecy, and delayed disclosures were typical reactions among children who have been sexually abused].)

Next, defendant urges us to follow decisions from other jurisdictions[6] that have found CSAAS evidence to be inadmissible. However, we are bound by *McAlpin* (*Auto Equity*, *supra*, 57 Cal.2d at p. 456) and have no reason to look beyond our state borders for guidance.

Finally, we reject defendant's claim that CSAAS evidence was unnecessary because there is no evidence of any juror having any misconceptions regarding child sexual assault abuse report. No California law imposes such a condition. To the contrary, the California Supreme Court has stated: "'[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.'" (*McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.) It is enough that a juror "might hold" misconceptions "about how a child reacts to a molestation." (*Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745 ["It is sufficient if the

---

**6** *Commonwealth v. Dunkle* (1992) 529 Pa. 168, 173-177 [602 A.2d 830] [Pennsylvania Supreme Court ruled CSAAS evidence is categorically inadmissible]; *State v. Schimpf* (Tenn.Crim.App. 1989) 782 S.W.2d 186, 193 [the court held child sexual abuse expert testimony was inadmissible, but the expert examined the victim and testified that the child "had, in fact, been sexually abused"]; and *State v. Davis* (1989) 64 Ohio App. 3d 334 [581 N.E.2d 604]. Following the Pennsylvania Supreme Court's decision in *Commonwealth v. Dunkle*, *supra*, "the Pennsylvania Legislature passed a law 'providing for the admissibility of this type of expert testimony.'" (*People v. Munch* (2020) 52 Cal.App.5th 464, 469.)

victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation"].)

Notwithstanding the above, defendant argues the admission of CSAAS testimony violated his due process right to present a defense. We disagree. The trial court's decision to allow CSAAS testimony resulted from the application of the rules of evidence and therefore did not infringe his right to present a defense. (*People v. Lawley* (2002) 27 Cal.4th 102, 155 [admission of CSAAS evidence did not violate due process]; *Patino*, *supra*, 26 Cal.App.4th at pp. 1746-1747 [same].) Borunda's testimony was permitted only to assist the jury in deciding whether or not Doe behaved in a manner consistent with the conduct of someone who has been molested and in evaluating her credibility.

### E. The Trial Court Properly Instructed the Jury with CALCRIM No. 1193

Defendant faults the trial court for instructing the jury with CALCRIM No. 1193, the pattern instruction on CSAAS testimony. He contends the instruction "effectively tells the jury that CSAAS evidence may be used to determine whether the victim's claims are true." We find no error in the jury instruction.

As given to the jury, CALCRIM No. 1193 stated: "You have heard testimony from Monica Borunda regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Monica Borunda's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against

31

him. [¶] You may consider this evidence only in deciding whether or not . . . Doe's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

"We review instructional error claims under a de novo standard of review. [Citation.] 'The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ."'" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)

Defendant faults CALCRIM No. 1193 as violating *Housley*. The *Housley* court found that because of the potential misuse of CSAAS evidence and the resulting prejudice to the defendant, in all cases in which an expert is called to testify regarding CSAAS, the trial court has a sua sponte duty to instruct that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housely*, *supra*, 6 Cal.App.4th at pp. 958-959.) The court reasoned that special precautions must be taken to ensure jurors do not accord an expert's opinion undue weight because it is beyond their expertise. (*Id*. at pp. 957-958.) According to *Housely*, CSAAS evidence is unusually susceptible of being misunderstood and misapplied by a jury, "perhaps because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred." (*Id*. at p. 958.)

CALCRIM No. 1193 was introduced after the *Housely* decision and states that CSAAS testimony is "not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged,]" and jurors "may consider this evidence only in deciding whether or not . . . conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim." (CALCRIM No. 1193.) Here, the jury was instructed that Borunda's testimony "is not evidence that the defendant committed any of the crimes charged against him" and that jurors "may consider this evidence only in deciding whether or not . . . Doe's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." That the instruction did not repeat *Housley's* instruction verbatim is not a sufficient basis to find error.

Post-*Housley*, courts have held the pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof. (*Gonzales*, *supra*, 16 Cal.App.5th at pp. 503-504; accord, *People v. Munch*, *supra*, 52 Cal.App.5th at pp. 473-474.) Contrary to defendant's contention, the instruction does instruct the jury to not use the expert's testimony in determining whether the victim's molestation claim is true. Rather, CALCRIM No. 1193 explicitly instructed the jury that "Monica Borunda's testimony . . . is not evidence that the defendant committed any of the crimes charged

33

against him."  We presume the jury was able to understand and correlate instructions and followed the instructions given.  (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

Given the trial court's advisement that the jury was not to consider the CSAAS testimony for any improper purpose, we conclude there is not a reasonable likelihood the jury applied CALCRIM No. 1193 in an impermissible manner.  (See *People v. Rivera* (2019) 7 Cal.5th 306, 326.)

### F.  Instructing on Lesser Included Offense

Defendant contends the trial court committed reversible error in failing to instruct the jury that sexual penetration of a minor (§ 289, subd. (j)) is a lesser included offense to aggravated sexual assault of a child under the age of 14 (§ 269, subd. (a)).  The Attorney General argues there was no error because section 289, subdivision (j), fails the statutory elements and the accusatory pleadings test.  We conclude there was no error.

### 1.  Further background information

Count 3 of the information charged defendant as follows:  "For a further and separate cause of action, being a different offense from but connected in its commission with the charge set forth in counts 1, and 2 hereof, the District Attorney of the County of Riverside hereby accuses KENNETH MICHAEL RODRIGUEZ KEPLEY of a violation of Penal Code section 269, subdivision( a), subsection (5), a felony, in that on, or between August 17, 2020 through February 2021, in the County of Riverside, State of California, the defendant did commit a violation of Penal Code section 289, subdivision (a), SEXUAL PENETRATION, by force, violence, duress, menace, fear and threat, upon

34

Jane Doe, a child who was under 14 years of age and seven or more years younger than the defendant."

The prosecutor requested the jury be given CALCRIM No. 1102, which instructed the jury that sexual penetration with a person under the age of 18 (§ 289, subd. (h)) is a lesser offense of count 3. With no objection from defense counsel, the trial court granted the prosecution's request and, in relevant part, instructed the jury as follows: "Sexual penetration with person under 18 (Penal Code § 289(h)) is a lesser crime of . . . Aggravated Sexual Assault of Child Under 14 Years (Pen. Code, § 269(a)) as charged in Count 3. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant participated in an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using a foreign object; AND [¶] 3. The other person was under the age of 18 years at the time of the act." The jury was not instructed on section 289, subdivision (j) as a lesser included offense to count 3.

### 2. Standard of Review

"A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561.) This obligation arises "whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*Ibid.*)

We review de novo whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

35

*3. Analysis*

To determine whether one crime is necessarily included in another, courts "apply either the elements test or the accusatory pleading test." (*People v. Shockley* (2013) 58 Cal.4th 400, 404; see *People v. Robinson* (2016) 63 Cal.4th 200, 207.) "'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.'" (*Shockley*, at p. 404; see also *People v. Gonzalez* (2018) 5 Cal.5th 186, 197 ["Under the elements test, one offense is another's 'lesser included' counterpart if all the elements of the lesser offense are also elements of the greater offense"].) "'Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.'" (*Shockley*, at p. 404.) "Consistent with the primary function of the accusatory pleading test . . . we consider *only* the pleading for the greater offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036 (*Montoya*), fn. omitted.) "When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*Robinson*, at p. 207; see *Shockley*, at p. 404.)

Section 289, subdivision (j) provides: "Any person who participates in an act of sexual penetration with another person who is under 14 years of age and who is more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years." Section 269, subdivision (a)(5), with which defendant was charged in count 3, requires only a seven-year age difference between the

36

defendant and the victim. Thus, as defendant acknowledges, section 289, subdivision (j), is not a lesser included offense of section 269, subdivision (a)(5), under the elements test.

The accusatory pleading test yields the same result. The information alleges only that Doe was "seven or more years younger than the defendant"; there is no allegation that she was more than 10 years younger than defendant. Nonetheless, relying on *People v. Ortega* (2015) 240 Cal.App.4th 956 (*Ortega*), defendant argues we should apply an "expanded accusatory pleading test," and look not only to the pleading document, but also the preliminary hearing transcript to establish for purposes of the accusatory pleading test that defendant is more than 10 years older than Doe. We decline to do so. Several appellate courts have rejected *Ortega's* reasoning as inconsistent with *Montoya*, *supra*, 33 Cal.4th at p. 1036, and many other Supreme Court cases state "that the accusatory pleading test looks solely to the language of the pleading itself." (*People v. Munoz* (2019) 31 Cal.App.5th 143, 158; accord *People v. Alvarez* (2019) 32 Cal.App.5th 781, 787; *People v. Macias* (2018) 26 Cal.App.5th 957, 964.) We agree that we are bound to consider "*only* the pleading for the greater offense" when applying the accusatory pleading test. (*Montoya*, at p. 1036; see *Auto Equity*, *supra*, 57 Cal.2d at p. 456.)

In his reply brief, defendant points out that the original felony complaint "stated" defendant's birthdate, and argues that this is an alternative basis to find that the accusatory pleading test was satisfied. Defendant's birthday, however, is only noted in the caption, along with his name. His birthdate is not included in the allegations of the substantive offenses. Defendant cites no authority, and we are aware of none, indicating

that we may use a birthdate included in a caption of a charging document (let alone a charging document superseded by a later-filed information) in applying the accusatory pleading test. Under the accusatory pleading test, even enhancement allegations or alternative sentencing schemes that are alleged with respect to an offense cannot be considered part of an accusatory pleading for purposes of identifying lesser included offenses. (*People v. Wolcott* (1983) 34 Cal.3d 92, 96; *People v. Woods* (2015) 241 Cal.App.4th 461, 473, 480, 482; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1398.) We are not persuaded that information set out only in a caption may be considered part of an accusatory pleading for purposes of determining a lesser included offense.

Notwithstanding the above, the Attorney General argues even assuming error, it was harmless because the jury was instructed on the lesser included offense of sexual penetration without force, fear, or duress (§ 289, subd. (h)) as to count 3. We agree. The jury had an option of convicting defendant of a lesser charge if it found the sexual penetration of Doe was without the use of force, fear, or duress.

## III.  DISPOSITION

Defendant's conviction on count 3 is modified to commission of nonforcible sexual penetration with another person who was under 18 years old (§ 289, subd. (h)). The sentence on count 3 is vacated.  The matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

McKINSTER_____

Acting P. J.

We concur:

MILLER_____

J.

RAPHAEL_____

J.

39